2013 OK CIV APP 83

**Susan KERLIN as Mother and Next Friend of RJK, a minor, Plaintiffs/Appellants,**

v.

**Shara D. HUNT, Defendant/Appellee.**

**No. 109074.**

Court of Civil Appeals of Oklahoma, Division No. 2.

Aug. 28, 2013.

Micky Walsh, Jerry Fraley, Beeler, Walsh & Walsh, P.L.L.C., Oklahoma City, Oklahoma, for Plaintiffs/Appellants.

S. Marc Walls, Angela D. Ailles & Associates, Oklahoma City, Oklahoma, for Defendant/Appellee.

DEBORAH B. BARNES, Vice–Chief Judge.

¶ 1 This is an appeal by Plaintiff/Appellant Susan Kerlin (Mother) as mother and next friend of RJK, a minor (RJK) (or collectively, Plaintiffs)[1] from a Judgment accepting a jury verdict and an Order of the District Court of Oklahoma County denying Plaintiffs' motion for a new trial.[2] Plaintiffs argue the trial court erred in refusing to grant a new trial because the verdict for the damages award was wholly inadequate and, therefore, contrary to law and the evidence. Because we conclude the trial court abused its discretion in the conduct of the proceedings, we reverse the trial court's Order denying Plaintiffs' motion for new trial and remand for a new trial on the issue of damages only.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 In April of 2009, Mother filed suit against Defendant/Appellee Shara D. Hunt (Hunt) alleging, in part, that Hunt's vehicle struck RJK as he was skateboarding in a crosswalk of a school parking lot causing RJK severe injuries, including excruciating physical and mental pain, and causing Mother to incur medical expenses on his behalf as a direct and proximate result of Hunt's negligence.[3]

¶ 3 Hunt answered denying all material allegations of the petition and demanding strict proof of Plaintiffs' allegations of Hunt's negligence, the medical expenses incurred, and RJK's mental and physical pain.[4] She also raised affirmative defenses including the allegation that RJK was negligent or contributed to the cause of the accident and that RJK's medical treatment was unreasonable and unnecessary.[5]

¶ 4 Trial was set for May of 2010.[6] At trial,[7] RJK testified he saw his foot being run over by Hunt's car. He said he tried to get up right after the accident, but knew immediately that something was wrong with his ankle. He said his ankle was "[e]xtremely" painful. He described the pain as "just a throbbing, sharp pain for a long time, days."[8] RJK was initially treated on the day of the accident at a local hospital. A splint was applied to his leg and he was given crutches. He was released but he returned later that evening to the hospital because his ankle had become very swollen and was hurting "so badly."[9] The splint was reset.

¶ 5 The next day, RJK saw orthopedic surgeon Dr. Gregory Zieders (Zieders) and was thereafter under his care.[10] Zieders unwrapped and removed the splint. RJK testified he had hundreds of fracture blisters on his ankle. RJK said he felt sharp pain, "like really, really tender skin that stung." Zied-

---

1. The party designation for Mother and RJK differs throughout the record on appeal. Each is named as a "Plaintiff" in some of the record, or collectively as "Plaintiffs" elsewhere in the briefs and record. Consequently, we will refer to the Appellants as noted.

2. By order of the Oklahoma Supreme Court, Plaintiffs timely filed an Amended Petition in Error to which they attached a copy of the Journal Entry of Judgment filed August 18, 2010.

3. R. at 1.

4. R. at 4.

5. R. at 5.

6. We take note that this case was transferred to the trial judge on May 14, 2010, only three days before trial began.

7. The parties moved to admit their exhibits before trial and the following exhibits were admitted, without objection: Pls.' Exs. 1–7 and Def.'s Exs. 1–47. Tr. at 4.

8. Tr. at 47.

9. Tr. at 48.

10. Tr. at 48. Several exhibits introduced by both the Plaintiffs and Hunt show RJK was seen for treatment and follow-up care by Zieders from February 12, 2009, through the eventual removal of hardware from RJK's ankle in March of 2010. R. at 143, Pls.' Ex. 1; R. at 142, Def.'s Exs. 1–4.

ers splinted the ankle.[11] RJK also continued using crutches at home.

¶ 6 RJK testified he was compliant with his doctor's instructions.[12] However, he also said that four days later, at his second visit to Zieders, Mother told Zieders that RJK walked to a convenience store near his home using his crutches and that he had removed the gauze around his splint and rewrapped it.[13] Mother was concerned that RJK did not know how serious his condition was. Zieders instructed RJK not to walk to the convenience store again and stated that taking off the splint was unacceptable.[14]

¶ 7 At the time of the second visit to Zieders, Mother testified the fracture blisters, which had been hundreds of tiny blisters on the ankle and almost up to his knee, merged into one large blister.[15] She said RJK was in constant pain and on pain medication from the time of the accident to the time of the first surgery in February 2009.[16] RJK underwent surgery on his leg the day after his second visit to Zieders and surgical hardware was placed in his ankle. Though the procedure was outpatient, RJK was hospitalized for two days. RJK wore a splint following surgery and later wore a boot. He was still using crutches for several weeks after surgery and had to keep his leg elevated. About six weeks after surgery, he was permitted to begin putting weight on his foot and ankle, progressing to 30% of his weight about a month after surgery, and eventually reaching 100% of his weight.

¶ 8 RJK was also treated at a wound care clinic for the fracture blister about ten days after his surgery.[17] RJK said the fracture blister had to be cut from his skin in order to determine whether healthy skin was beneath it. He said the procedure was "very painful" and the anesthetic did not help.[18] About this time, RJK also started physical therapy.[19] He said the physical therapy was very painful at first: "Just the muscle alone, trying to stretch that back out, hurt." [20] He continued physical therapy for about two months. About a year after the surgery, Zeiders surgically removed the hardware from RJK's ankle.[21]

¶ 9 Plaintiffs presented evidence of medical expenses through testimony provided by Zieders, RJK, and Mother totaling $50,774.93.[22] Hunt did not present separate medical testimony.

¶ 10 At the close of the testimony, the trial court dismissed the jury to finalize the jury instructions. With the exception of a minor revision to which all parties agreed,[23] Plaintiffs had no objection to the instructions. Hunt had one objection which the court denied.[24] Twenty-seven instructions were ap-

11. Tr. at 80.

12. Tr. at 71.

13. Tr. at 72–73, 80–81.

14. R. at 142, Def.'s Ex. 2.

15. Tr. at 81.

16. Tr. at 83.

17. Tr. at 83; R. at 142, Pls.' Ex. 1.

18. Tr. at 51.

19. Tr. at 52. R. at 142, Pls.' Ex. 1.

20. Tr. at 54.

21. Tr. at 58.

22. R. at 143, Pls.' Exs. 2 and 3. Zieders' testimony was provided via video deposition; however, no transcript of his testimony is designated in the record on appeal. Tr. at 76.

23. Tr. at 147 (removal of an instruction that was irrelevant to the facts of the present case).

24. Hunt's attorney objected to the jury instructions regarding the use of separate verdict forms for Mother and RJK regarding medical expenses. Tr. at 148. Hunt's attorney argued that pursuant to 12 O.S.2011 § 2025.1, Mother's cause of action for medical expenses—expenses she was obligated by law to incur on behalf of RJK—merged with RJK's cause of action; therefore, only one set of instructions should be given to the jury: one blue verdict form for RJK, one pink verdict form for Hunt, or one white verdict form, for contributory negligence, if any. The court denied Hunt's argument and allowed two blue verdict forms: one for RJK, and one for Mother as to her medical expenses. Tr. at 149–50. Hunt, however, does not appeal from the court's denial of her objection to the use of both blue verdict forms.

proved by the court for use.[25]

¶ 11 After closing arguments, the court instructed the jury that if it reached a verdict it was to select "only the correct form of verdict...."[26] The jury instructions and the exhibits were sent to the jury room with the jury for its deliberations. During deliberations, the jury sent a handwritten note to the court which asked: "What are out-of-pocket expenses incurred by Plaintiff related to medical bills not covered by insurance? Were cell phones involved? Did the driver use a cell phone during impact?" The judge's answer was: "You have all the evidence [and] law necessary to make a decision."[27]

¶ 12 The jury returned only the white verdict form finding "Plaintiff's" negligence contributed 42% to the cause of the accident and Hunt's negligence contributed 58%.[28] The jury further found "Plaintiff's" damages to be $10,000. As a result of discussions with the parties' attorneys, the judge polled the jurors, as follows:

THE COURT: Ladies and gentlemen of the jury, I have a question to ask of the white verdict that you have completed. You have found that the sum of the defendant's (sic) damages are $10,000. And what I would like to inquire of each of the jurors is whether or not that amount included both the claim for medical expenses as well as any additional damages, or did it exclude medical expenses.

And so I'm going to start with Juror No. 1. Did the $10,000 amount include damages for medical expenses ... ?[29]

Each juror, in turn, answered that question, "Yes."

¶ 13 Out of the jury's presence, the court expressed concern about where the jury's answer left them. Plaintiffs' counsel said he

---

25. R. at 71–107. Among them were the following instructions:

Instruction Two: The jury was told it was the judge's duty to determine all applicable law and to inform the jury of that law. The jurors were told it was their duty to determine the facts from the evidence presented, and that evidence, among other things, included "the exhibits, if any, entered into evidence...." They were further instructed that they were permitted to "draw such reasonable inferences from the testimony and exhibits, "as they felt justified when considered with the aid of the knowledge with which each of you possess in common with other persons." They were instructed that they "may make deductions and reach conclusions which reason and common sense lead you to draw from the facts you find to have been established by the testimony and the evidence."

Instruction Three: The jurors were again instructed that they will only consider as evidence, among other things, "any exhibits which have been introduced...."

Instruction Nineteen: The jury was instructed that if it found for RJK, then it was to fix the "amount of money that will reasonably and fairly compensate him for the injury he sustained as a result of" Hunt's negligence. The jurors were told in fixing that amount among the elements they may consider are:
A. his physical pain and suffering, past and future;
B. his mental pain and suffering, past;
C. his age;
D. his physical condition immediately before and after the accident;
E. The nature and extent of his injuries.

Instruction Twenty: The jury was instructed that if it found for Mother, "you must then fix the amount of her damages. This amount is the amount of money that will reasonably and fairly compensate her for loss sustained as a result of" Hunt's negligence. In fixing that amount, the jury was told it "may consider ... the reasonable expenses of the necessary medical care, treatment and services" Mother incurred on behalf of RJK.

Instruction Twenty–One: The jury was advised that "[o]nly one of several possible verdicts may be the ultimate conclusion reached by this jury." The jury was instructed that the "options available" were set out on color-coded verdict forms.

Instruction Twenty–Two: The jury was given directions about the blue verdict form for RJK and a blue verdict form.

Instruction Twenty–Three: The jury was given directions about the blue verdict form for Mother and a blue verdict form.

Instruction Twenty–Four: The jury was given directions about the pink verdict form for Hunt and a pink verdict form.

Instruction Twenty–Five: The jury was given directions about the white verdict contributory negligence form should it find Hunt negligent and "Plaintiff" negligent and a white verdict form.

26. Tr. at 177.

27. R. at 142.

28. Tr. at 179–80; R. at 70.

29. Tr. at 183–84.

thought the court had "to let this jury go, and we have a verdict." [30] He stated he would have to file post-trial motions, to which Hunt's attorney agreed. Plaintiffs' counsel also expressed concern over the adequacy of the verdict as a matter of law as to medical expenses because Hunt provided no evidence that the medical expenses were unreasonable or unnecessary. He also expressed concern about the jury's question during deliberations regarding the out-of-pocket medical expenses of "Plaintiff," stating the jury was considering matters outside that which they should have been considering.[31]

¶ 14 With the agreement of the parties' attorneys that there was nothing further she could do "to resolve what may be the difficulties," [32] the judge discharged the jury from service; however, she told the jury she had some questions about a few issues.[33] The Journal Entry of Judgment (Judgment) was issued August 18, 2010, in which the court stated, in part, "The jury ... found that the damages incurred by the Plaintiff [RJK] ... totaled $10,000. The jury was polled following this verdict. The jury acknowledged the $10,000 was inclusive of the medical expenses that had been incurred on behalf of [RJK]." [34]

¶ 15 Plaintiffs filed their motion for new trial only on the question of damages because of the inadequacy of the award with respect to both RJK's damages and Mother's medical expenses incurred on his behalf.[35] Plaintiffs argued the jury disregarded Instructions Nineteen and Twenty which "clearly set forth the parameters that the jury should have used in determining an amount of money that would fairly compensate [RJK]. The jury obviously disregarded these [I]nstruc-

tions." [36] Plaintiffs also referenced the note sent by the jury during deliberations asking about Mother's out-of-pocket medical expenses not related to insurance, and referenced a post-verdict ex parte discussion between the trial court and the jury, arguing that "[i]t appears that the jury panel substituted their own sense of justice and fairness in arriving at their verdict." [37] On December 28, 2010, the court entered its Order denying Plaintiffs' motion for new trial.

¶ 16 It is from the trial court's Judgment and acceptance of the jury's verdict and Order denying their motion for new trial that Plaintiffs appeal.

## STANDARD OF REVIEW

¶ 17 While the showing for reversal where a motion for new trial is denied need not be as strong as the showing for reversal where a motion for new trial is granted, *Taliaferro v. Shahsavari*, 2006 OK 96, ¶ 15, 154 P.3d 1240, 1245, in examining a trial court's denial of a motion for new trial, the standard of review on appeal is abuse of discretion. This Court will not reverse a trial court under this standard unless the trial court "reached a conclusion that is clearly against the evidence and reason." *Conoco, Inc. v. Agrico Chem. Co.*, 2004 OK 83, ¶ 14, 115 P.3d 829, 834 (citation omitted). An abuse of judicial discretion occurs "when discretion is exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Patel v. OMH Med. Ctr., Inc.*, 1999 OK 33, ¶ 20, 987 P.2d 1185, 1194 (footnote omitted).

30. Tr. at 185.

31. Tr. at 185–86.

32. Tr. at 186.

33. Tr. at 187.

34. R. at 108.

35. R. at 115–16. Plaintiffs also moved for judgment notwithstanding the verdict as to medical expenses incurred in the amount of $50,744.93 because Hunt introduced no testimony challenging the reasonableness of that expense. R. at

116. However, while Plaintiffs moved for judgment n.o.v., they never moved for directed verdict at the end of all the evidence; consequently, pursuant to 12 O.S.2011 § 698, they had no basis for filing that post-trial motion and the trial court was without power to act on it.

36. R. at 114.

37. R. at 114. Although Hunt offered a different argument as to the significance of this discussion, Hunt's objection to Plaintiffs' motion also refers to discussions the jury had with the court "after the verdict had been accepted and the parties released." R. at 124.

## ANALYSIS

¶ 18 Plaintiffs assert two propositions on appeal. The trial court committed reversible error when it failed to grant Plaintiffs a new trial because (1) the jury verdict with respect to RJK's medical expenses was inadequate and contrary to the undisputed facts, and (2) the jury's verdict failed to award damages to RJK for pain and suffering though the evidence was undisputed that he incurred personal injury.

¶ 19 Although Plaintiffs do not expressly rest their argument on the absence of an instruction concerning the collateral source rule,[38] they do raise the issue of jury misconduct in considering medical insurance and argue, in part, that the trial court committed reversible error pursuant to 12 O.S.2011 § 651(1) in not granting a new trial.[39] Relying on *Taliaferro*, they argue:

> When a party is prevented from having a fair trial as a result of an error which materially affects the substantial rights of the party, a new trial is required. Reversible error has been held to be an error that creates a probability of change in the outcome of the lawsuit.

2006 OK 96, ¶ 13, 154 P.3d at 1244 (footnotes omitted). They also reference an ex parte, off-the-record discussion the trial court had with the jury after the jury was discharged, but prior to the court's ruling on their motion

for new trial. For the reasons discussed in this Opinion, we reverse the court's Order and that portion of the Judgment accepting the jury's damages award both as to Mother and RJK and remand for further proceedings.

### I. Collateral Source Rule

■ ¶ 20 The record presented to this Court on appeal contradicts both parties' positions relating to the jury's knowledge about medical insurance. Hunt asserts that no one—not she, not Plaintiffs, not the trial court—ever mentioned the existence of insurance to the jury.[40] Yet, the exhibits offered by Hunt—without objection by Plaintiffs—clearly state the name of Plaintiffs' medical insurance carrier.[41] Indeed, even Plaintiffs' exhibits indicate that RJK was covered by medical insurance. Although an attempt was made by Plaintiffs to redact that information from the exhibits, either the redaction was obviously placed under the heading "medical insurance"—so only the name of the carrier was omitted, not the fact of such insurance[42]—or the marker used to redact was inadequate in concealing the name of the insurer—that is, the name was clearly visible through the mark.[43] Moreover, some of the exhibits clearly reveal that the medical insurance carrier paid a certain amount of the medical costs and indicated what cost re-

---

**38.** In *Estrada v. Port City Properties, Inc.*, 2011 OK 30, ¶ 27, 258 P.3d 495, 505, the Oklahoma Supreme Court stated, "Under the collateral source rule, benefits received by the plaintiff from any source other than the tortfeasor will not reduce the quantum of recoverable damages." (Citing *Gladstone v. Bartlesville Indep. Sch. Dist.* No. 30, 2003 OK 30, ¶ 22 n. 56, 66 P.3d 442, 452 n. 56). The Court further stated the collateral source rule has "been summarized as traditionally applying in the context of common law tort actions to determine the amount of compensatory damages which will compensate the injured party for all damages proximately cause[d]." *Estrada*, ¶ 27 n. 39, 258 P.3d at 505 n. 39 (citing *Worsham v. Nix*, 2006 OK 67, ¶ 19 n. 7, 145 P.3d 1055, 1062 n. 7) (citation omitted).

**39.** Section 651(1) provides, in part, as follows:

A new trial is a reexamination in the same court, of an issue of fact or of law or both, after a verdict by a jury, the approval of the report of a referee, or a decision by the court. The former verdict, report, or decision shall be

vacated, and a new trial granted, on the application of the party aggrieved, for any of the following causes, affecting materially the substantial rights of the party:

1. Irregularity in the proceedings of the court, jury, referee, or prevailing party, or any order of the court or referee, or abuse of discretion, by which the party was prevented from having a fair trial[.]

**40.** Answer Brief at 15.

**41.** R. at 142, Def.'s Exs. 4, 5, 7, 9 and 10.

**42.** *See, e.g.*, R. at 143, Pls.' Ex. 1, Edmond Medical Center (though the multiple-page exhibit is not numbered, the relevant document is at page 15 of the exhibit).

**43.** *See, e.g.*, R. at 143, Pls.' Ex. 1, Midwest Regional Medical Center (though the multiple-page exhibit is not numbered, the relevant document is at page 3).

mained for Plaintiffs to pay.[44]  Consequently, Plaintiffs' assertion is inaccurate that the first inkling of the jury's eventual verdict—one in which medical insurance might have been considered by the jury in arriving at its verdict—was the question the jury asked during deliberations about medical insurance.

¶ 21 That the jurors had this information before them in "exhibits" offered by both parties also appears to contradict Plaintiffs' argument that the jury acted inappropriately in arriving at its verdict.  Several instructions given by the trial court to the jury—both before the case began and before the jury's deliberations—clearly instructed the jurors to consider the *exhibits* offered into evidence in arriving at their verdict.  Moreover, the jurors were informed in Instruction Twenty that if they found for Mother, they were to fix an amount for her damages, an amount that would "reasonably and fairly compensate her for *the loss sustained* as a result of" Hunt's negligence.[45]  They were explicitly instructed that in fixing that amount they may consider "[t]he reasonable *expenses* of the necessary medical care, treatment and services *she has incurred* in behalf of [RJK]." Plaintiffs did not object to any of these instructions nor did they ask for an instruction admonishing the jury not to consider Mother's medical insurance in arriving at its award of damages, if any.  The jury, therefore, does not appear to have deviated from the instructions they were actually given.

¶ 22 Plaintiffs and Hunt were responsible for bringing the matter of medical insurance to the attention of the jury and there is nothing in the record on appeal that shows Plaintiffs ever requested a curative instruction either before or during the jury's deliberations.  Plaintiffs' failure to object to Hunt's exhibits that introduced into evidence the existence of Mother's medical insurance and Plaintiffs' introduction of their own exhibits of that evidence, act as a waiver of any objection Plaintiffs have to that evidence.  *See State ex rel. A.W.,* 2011 OK CIV APP 27, ¶ 27, 250 P.3d 343, 350; *Rucker v. Mid Century Ins. Co.,* 1997 OK CIV APP 47, ¶¶ 14–15, 945 P.2d 507, 510–11.[46]

## II.  Inadequacy of the Award

¶ 23 Plaintiffs' argument concerning the adequacy of the medical expenses award centers on their assertion that the evidence of the amount and reasonableness of those expenses was uncontroverted, and several Instructions set "the parameters that the jury should have used in determining an amount of money that would fairly compensate Plain-

---

44.  *See, e.g.,* R. at 143, Pls.' Ex. 3 (though the multiple-page exhibit is not numbered, the relevant documents are at pages 1 and 2 of the exhibit).

45.  R. at 94 (emphasis added).

46.  Nor is this a circumstance where "fundamental error" can be claimed as a basis for reversal. Plaintiffs did not assert below nor do they assert on appeal that any of the instructions that were given by the court were erroneous.  If any error was committed, that error was in the form of an omission;  the jury was never instructed that it should not consider Mother's medical insurance in its assessment of damages though evidence of such insurance was before it.  As stated in *Sellars v. McCullough,* 1989 OK 155, ¶ 10 n. 13, 784 P.2d 1060, 1063 n. 13, "It is the duty of the trial court on its own motion to properly instruct the jury upon the decisive issues made by the pleadings and the evidence introduced at the trial, and a failure so to do constitutes fundamental error," even if no exception is made to the instructions. (Citation omitted.)  However, the Oklahoma Supreme Court has also stated,

Fundamental error is narrowly defined as a substantial misstatement of a fundamental legal principle which appears on the face of the instruction. When an appellant does not except to an instruction, the appellate court's review of its correctness is confined to a four-corner search for fundamental error.

*Wetsel ex rel. Wetsel v. Indep. Sch. Dist. I–1,* 1983 OK 85, ¶ 27, 670 P.2d 986, 995 (footnotes omitted).  In *Wetsel,* the appellants never raised the issue of *res ipsa loquitur* at trial or objected to the trial court's failure to include an instruction on *res ipsa loquitur;* consequently, the error, if any, was outside the instructions that were actually given and did not constitute fundamental error.  The Supreme Court said that absent an objection to that failure at trial, the issue was not properly preserved for appeal.  *Cf. Fletcher v. Monroe,* 2009 OK 10, ¶ 12, 208 P.3d 926, 930 (instructions *given* on an issue irrelevant to the cause of action in a jury trial is fundamental error requiring the granting of a new trial) (footnote omitted).

tiffs."[47] They argue that "[t]he only evidence that the jury was provided as to the medical expenses was that they were $50,774.93." Hunt, of course, disagrees about the medical evidence, arguing that while she did not put forward any medical testimony, the evidence before the jury demonstrated that RJK had acted in a way that the jury may have believed exacerbated his condition and thus increased his medical costs.

¶ 24 Plaintiffs also assert that the damage award is inadequate because it failed to award RJK damages for pain and suffering and other damages other than medical expenses. They argue that "[w]hen the jury awarded $10,000.00 in damages to [RJK], they attempted to reimburse the out-of-pocket expenses paid by [Mother]."[48] Plaintiffs, therefore, argue that the jury improperly awarded RJK zero dollars for his pain and suffering because the evidence is undisputed that he experienced and sustained pain and suffering. Hunt disagrees and argues that the polling of the jury revealed that the jury award represented an award both for medical expenses and for RJK's other damages.

■ ¶ 25 Although Plaintiffs did not specifically argue that the judge's action was an abuse of discretion warranting a new trial, the judge's ex parte communication and the substance of that off-the-record communication were referenced below and again on appeal. We are deeply troubled by the judge's ex parte discussion and its implications given the lack of clarity the attorneys and the judge expressed about the jury's verdict, a lack of clarity that was apparently not sufficiently addressed by the court's polling of the jury. A trial court has wide

discretion in conducting a jury trial and its conduct will not be a basis for reversal unless an abuse of discretion is shown. *Stephens v. Draper*, 1960 OK 69, ¶ 18, 350 P.2d 506, 510. However, in *Stephens*, the Oklahoma Supreme Court also stated that where a verdict is ambiguous or otherwise incomplete given the court's instructions, the proper action by the trial court is to direct the jury to continue deliberations. *Id.* ¶ 12, 350 P.2d at 509.

■ ¶ 26 In their motion for new trial, and again on appeal, Plaintiffs reference the trial judge's post-verdict discussion with the jury and recount what was allegedly stated in that off-the-record discussion.[49] Generally, this Court will not take notice of matters that are not part of the appellate record.[50] However, "[a]dmissions made in the briefs may be considered as supplementing and curing an otherwise deficient appellate record." *State ex rel. Macy v. Bd. of Cnty. Comm'rs*, 1999 OK 53, ¶ 3 n. 8, 986 P.2d 1130, 1133 n. 8 (citations omitted). Hunt does not deny the substance or accuracy of Plaintiffs' representations and specifically addresses the significance—or in her view, lack of significance—of this discussion on this appeal. Moreover, the record reveals that the trial judge initiated this discussion with the jury, excused the attorneys and their clients, and conducted the discussion off the record.[51] Therefore, under the circumstances of this case, we will take this off-the-record discussion into consideration on this appeal.

¶ 27 In the discussions among the parties' attorneys and the judge following the verdict, the record clearly demonstrates the concern the attorney for Plaintiffs had about whether the verdict included damages for medical expenses as well as other damages suffered by

47. Brief-in-chief at 5.

48. Brief-in-chief at 8.

49. R. at 112; Brief-in-chief at 3, n. 1.

50. Oklahoma Supreme Court Rule 1.33(d) provides:

The record on appeal shall consist only of those portions of the "entire trial court record" properly designated by a party to the appeal or ordered by the appellate court. The "entire trial court record" shall consist

of all papers and exhibits filed in the trial court, the reporter's notes and transcripts of proceedings, and the entries on the appearance docket in the office of the trial court clerk. A copy of the appearance docket shall be included in the record on appeal. Only papers filed and exhibits presented to the trial court together with transcripts necessary to the appeal may be included in the record on appeal.

Okla. Sup.Ct. R. 1.33(d), 12 O.S.2011, ch. 15, app. 1.

51. Tr. at 187.

RJK, and thus whether the jury properly followed the jury instructions.[52] Hunt's attorneys said they were "not sure [the jury was] instructed specifically to return the blue verdict form if [the jury] found with the white [verdict] form. That's why I think it would be unclear what [the verdict] represents."[53] Plaintiffs' attorney agreed that "[i]t's very unclear. I thought that was the deal, ... if [the jury] came back and they found that [RJK] was entitled to recover, then the blue verdict form should have come back with the medical as well."

THE COURT: Let me ask this: Based on my ruling that the two claims did not merge together, is there an agreement by defense counsel that because there was negligence attributable to [Hunt], and in this case it was over and above 50 percent, that [Hunt] would also be liable to [Mother] with the entire amount of medicals?

[HUNT'S ATTORNEY]: I don't think we can agree to that, Judge, because our position was there should be one verdict form.

THE COURT: And my question was based upon my ruling, however ... [a]nd I guess I'm asking how do you want me to handle this. We can either agree that as a result of my ruling there will be a verdict rendered in [Mother's] amount for the damages, the $50,000, or I can instruct the jury that the contributory negligence of [RJK] is not—I mean, we basically have a finding that [the jury] have found that [Hunt] is negligent.

So I'm wondering procedurally, do I have the jury go back and complete the blue verdict form, basically telling me if you find [Hunt] was even one percent negligent the blue verdict should have been signed also on behalf of [Mother].

[HUNT'S ATTORNEY]: The problem with that may be that they assumed that this was the only money recovered by both.

[HUNT'S ATTORNEY]: That's my concern, is that this amount is theirs and it

represents the total amount; that's why I'm afraid it is not clear what their verdict is.

[PLAINTIFFS' ATTORNEY]: Judge, there was absolutely no testimony to show that the medical was not reasonable and necessary. I mean, if this was intended to cover both medical and pain and suffering, then we have a real problem with the verdict.[54]

¶ 28 The judge then suggested that she poll the jury to determine whether the $10,000 damages award encompassed both Mother's claim for medical expenses and RJK's damages as set forth in one of the jury instructions, "basically, all of his damages except for medical bills." Plaintiffs' attorney argued that procedure was "improper, because I don't think they could do that under the instructions that you gave them."[55] Nevertheless, the judge polled the jurors, as follows:

THE COURT: Ladies and gentlemen of the jury, I have a question to ask of the white verdict that you have completed. You have found that the sum of the defendant's (sic) damages are $10,000. And what I would like to inquire of each of the jurors is whether or not that amount included both the claim for medical expenses as well as any additional damages, or did it exclude medical expenses.

And so I'm going to start with Juror No. 1. Did the $10,000 amount include damages for medical expenses ... ?[56]

Each juror answered "Yes."

¶ 29 In the ensuing conversation, the attorneys for Hunt said any concerns Plaintiffs had would have to be "handled in post-trial motions," and that "[i]t seems apparent from the polling that [the jury] intended to resolve both [Mother's] and [RJK's] claims with this verdict."[57] Plaintiffs' attorney replied:

Then what we have is ... a verdict that is inadequate as a matter of law with no proof whatsoever that this medical was not reasonable and necessary. In fact, there

**52.** Tr. at 182–83.

**53.** Tr. at 181.

**54.** Tr. at 181–82.

**55.** Tr. at 183.

**56.** Tr. at 183–85.

**57.** Tr. at 185.

was absolutely nothing by the defense on that point, so I think ... I'm going to have to be forced to ... ask this court for either an additur or a motion for a new trial. But I agree, I think this jury is done. And I think that question that came out [during deliberations] about the—what out-of-pocket medical expenses—the jury obviously considered something extraneous to what that should have been considering in this case.[58]

¶ 30 The trial judge then asked: "So is everyone in agreement, then, that I will discharge this jury, and there is nothing further that I can do through questioning this jury to resolve what may be the difficulties?"[59] The attorneys agreed. The judge repeated: "So everyone is in agreement there is nothing further that I can do with this jury to remedy the situation?" Everyone agreed. The judge then discharged the jury, but then stated:

> I appreciate the attention ... that you have given during this trial. What I would like to do is ask you-all a few questions outside of the presence of counsel and their clients for a few moments.
>
> So if I can ask you to please excuse yourselves, then I would like to speak to the jury about a couple of issues.[60]

¶ 31 Although none of the parties objected to the judge's discussion with the jury, no record of the discussion was made. According to Plaintiffs, after the discussion, the judge, the parties, and their attorneys returned to the courtroom.[61] According to Plaintiffs, the judge then "indicated that the jurors had decided that [because Mother] was a teacher, that she must have had major medical insurance," and "surmised that at most [Mother] would have been out-of-pocket 20% of the medical expenses totaling $50,774.93." Plaintiffs further state the judge "indicated that the jurors were fully aware as to the nature and extent of the injuries that had been sustained by [RJK],

but felt that the $10,000.00 award, minus the contributory negligence, would be fair compensation [to him] for his injuries and for the medical expenses that were incurred."

¶ 32 As previously noted, Hunt does not deny that this discussion occurred or contradict Plaintiffs' statement about what the judge told the parties and the attorneys following that discussion. Hunt states that Plaintiffs cite no authority that "this type of informal discussion is a basis to impeach a jury verdict,"[62] and the only exception to this rule is jury misconduct. Because Plaintiffs did not allege such misconduct below, Hunt argues, the trial judge did not abuse her discretion in failing to take their words into account in denying the motion for new trial.

¶ 33 Hunt further relies on *Downum v. Muskogee Stockyards & Livestock Auction, Inc.*, 1977 OK 111, 565 P.2d 368. In that case, by affidavit, the foreman asserted the jury intended to award an amount different from that which ultimately was stated on the comparative negligence verdict form. The Supreme Court stated the affidavit could not be used, on "public policy grounds" to impeach the verdict "to show on what grounds it was rendered, or to show a mistake in it or that the jury misunderstood the charge of the court, or that they otherwise mistook the law, or the result of their findings." *Id.* ¶ 6, 565 P.2d at 369 (footnote omitted). Hunt argues that the information disclosed to the trial judge in this case during the ex parte communication she had with the jurors is "the same type of information" as the foreman's affidavit in *Downum*, and thus it is information that should not have been and was not considered by the court in making its decision on the motion for new trial.

¶ 34 We do not agree that the circumstances addressed by the Supreme Court in *Downum* are like the circumstances presented by the trial judge's actions in this case. It is the trial judge's conduct of the proceedings, no matter how well intended, that impli-

---

58. Tr. at 185–86.

59. Tr. at 186.

60. Tr. at 187.

61. Brief-in-chief at 3, n. 1.

62. Answer Brief at 15. Hunt cites *Oxley v. City of Tulsa*, 1989 OK 166, ¶ 25, 794 P.2d 742, 747, wherein the Oklahoma Supreme Court stated, "The cases are legion in which this Court has ruled that affidavits, depositions, and oral testimony *of jurors* may not be used to impeach a jury verdict." (Citation omitted and emphasis added.)

cates the fairness of the proceedings below. Communications by a trial judge with a jury "in cases that have been tried to conclusion, as opposed to cases that have been settled or mistried during trial ... run the significant risk that one or more jurors will say something that then becomes an issue with respect to the verdict reached...." *Davis v. Husain*, No. A–2691–11T2, 2013 WL 949496 at *9 (N.J.Super.App.Div. March 13, 2013) (unpublished) (discussing *Ertle v. Starkey*, 292 N.J.Super. 1, 678 A.2d 261 (N.J.Super.App.Div.1996)). In *Davis,* the court referenced another New Jersey case wherein it was observed there was "no principled reason for permitting ex parte communications concerning the jury's deliberations once a verdict has been rendered and the jury discharged." *Davis*, 2013 WL 949496, at *9 (quoting *State v. Walkings*, 388 N.J.Super. 149, 906 A.2d 504, 510 (N.J.Super.App.Div.2006)).

¶ 35 The New Jersey courts base their reasoning, in part, on provisions of the Code of Judicial Conduct. Canon 2 of the Oklahoma Code of Judicial Conduct provides: "A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter," except under certain circumstances. Rule 2.9(A), 5 O.S.2011, ch. 1, app. 1–A. Like the situation in *Davis,* here the trial judge initiated the discussion with the jury, out of the presence of the parties and counsel, and made no record of the discussion. Unlike the judge in *Davis,* the trial judge in the present case apparently [63] did not ask the parties or counsel to keep what she told them in confidence. However, she did apparently reveal to them discussions by the jury with her that appear to go directly to the matter Plaintiffs' attorney told the trial judge he would be addressing in his impending motion for new trial. The judge's on-the-record statement that she had "questions" for the jurors about certain "issues" supports that troubling conclusion.

¶ 36 Although discussed in the context of a criminal defendant's right to be present at every stage of the proceedings, the court's observation in *Walkings* is instructive. There a post-verdict ex parte discussion occurred between the trial judge and a juror who was concerned about what had occurred during the jury's deliberations. The judge ultimately determined the juror's concerns were not relevant. The *Walkings* Court observed:

No matter how innocuous the judge may have considered the juror's concerns—and we note that the judge did not come to the conclusion that the juror's concerns were insubstantial until after the ex parte communication; he apparently had determined that the juror's initial communication to the prosecutor's office was sufficiently troubling and required further examination or else we assume he would not have initiated the ex parte communication—no communication should have taken place without the defendant having been given notice of and an opportunity to be heard and to be present at any such communication between the judge and the juror.

906 A.2d at 511.

¶ 37 In the present case, after having polled the jury, the trial judge twice asked the litigants if they wanted her to do anything further to address the problems raised by Plaintiffs with respect to damages for medical expenses and lack of clarity about the verdict discussed by all the attorneys and the judge prior to the discharge of the jury. All the attorneys agreed there was nothing further the judge could do. Yet, the very matters apparently discussed among the judge and the jurors in the ex parte discussion concerned those issues. Consequently, like the judge in *Walkings* who must have initially thought there was something of concern about the juror's inquiry, it *appears* that here the trial judge continued to have some concern about what the jurors meant by their verdict and questioned them about it. Even if she ultimately did not consider that discussion in her denial of Plaintiffs' motion for new trial—as Hunt assumes—there is an appearance of impropriety; that is, it appears the trial judge discussed issues with the jury ex parte that went to matters the judge knew she was going to be asked to address in a post-trial motion from Plaintiffs.

---

**63.** We are hesitant to say what the trial judge may or may not have said because these matters were off the record, a circumstance that adds to the troubling nature of these events.

There is, thus, an appearance that the discussion had an impact on her decision to deny the motion for new trial; that is, the discussion clarified an ambiguity the judge apparently still thought was present about the jurors' use of only the white verdict form. Under these circumstances, we are persuaded by the reasoning in the aforementioned New Jersey cases. We, therefore, consider the trial judge's action in conducting the ex parte discussion to have been an abuse of discretion.

¶ 38 We further conclude Plaintiffs were substantially prejudiced by the court's actions. By conducting the discussion outside the presence of the parties and their counsel, the trial judge prevented Plaintiffs from either questioning the jury or otherwise calling into question the jurors' apparent intent to award Mother only her out-of-pocket medical expenses at a figure of twenty percent of the actual medical expenses they apparently believed she incurred.[64] That information is very different from the information elicited by the court's polling of the jury and goes squarely to the concerns raised by Plaintiffs in discussions with the court prior to the discharge of the jury.[65] Further, because only the white verdict form was returned by the jury, there is no effective way to know what portion of the $10,000 award was awarded for medical expenses and what portion was awarded for RJK's other damages.[66] Consequently, we reverse the court's Order denying the motion for new trial and reverse the Judgment accepting the jury's award of $10,000 in damages for Mother and RJK, and remand for a new trial only on the issue of damages, both as to Mother and RJK.

## CONCLUSION

¶ 39 We conclude the trial court abused its discretion in conducting an ex parte communication with the jury after the jury was discharged but prior to the court's ruling on a motion for new trial it had been informed

---

64. Other courts that discourage post-verdict ex parte discussions with the jury have also recognized, as do we, the valuable educational and salutary role post-verdict discussions with the jury may engender. In *Harris v. U.S.*, 738 A.2d 269 (D.C.Ct.App.1999), the court explained, as follows:

We do not mean to imply that trial court judges should cease their efforts to provide an opportunity for jurors to talk to the court about matters which might have arisen during the course of trial. That opportunity could be a welcome one to jurors at the conclusion of what might have been a stressful experience and, equally important, it may provide useful and appropriate information about ways to improve the jury service experience.

*Id.* at 278. The court went on to note that such judicial efforts are "salutary and are to be commended—provided they are made subject to certain procedural safeguards to avoid and, if necessary, mitigate, unanticipated disclosures such as the one that occurred in this case." *Id.* at 278–79. In that case, a criminal proceeding, the court referenced the then new American Bar Association (ABA) standards for criminal trials, *ABA Standards for Criminal Justice Discovery and Trial by Jury* 119 (3d ed.1996). Referencing Standard 15-4.3, Judicial communication with jurors, the court said:

In an effort to accommodate the rights of criminal defendants to be present at each important stage of the proceedings without deterring court systems' efforts to improve the jury experience, the ABA has recommended that any discussions between a court and the jurors following the conclusion of trial and the completion of the jurors' service be conducted "only on the record and in open court with counsel having the opportunity to be present." *Harris*, 738 A.2d at 279. Such a practice would equally safeguard the rights of litigants in civil cases. *See, e.g.*, Annotated Model Code of Judicial Conduct Canon 3(B)(7) (2004).

65. These facts are, for example, different from those in the *Davis* case, where the New Jersey court found the trial court abused its discretion, but concluded the comment elicited during the ex parte discussion did not warrant overturning the jury verdict. Among the reasons the court there found reversal was not warranted were the facts that no motion for new trial was made, the award to defendant was modest and consistent with the facts presented at trial, and no juror indicated that the witness's conduct in that case influenced his or her decision on the issue of credibility, including the juror who made the remark about the witness. *Davis*, 2013 WL 949496 at *10. Here, the motion for new trial included the twenty percent out-of-pocket basis for the award, and the apparent disclosure by the judge of what the jury said in the ex parte discussion suggests all of the jurors based the award on the twenty percent figure.

66. *Cf. Irwin v. SWO Acquisition Corp.*, 1992 OK CIV APP 48, ¶¶ 5–6, 830 P.2d 587, 589 (general verdict form used and no indication on the verdict that the sum given was for medical expenses only; therefore, cannot claim sum excluded amount for pain and suffering) (discussing *Vickers v. Ittner*, 1966 OK 175, 418 P.2d 700). Consequently, the entire issue of damages must be retried.

would be filed by Plaintiffs. Therefore, we conclude the trial court erred in failing to grant Plaintiffs' motion for new trial. Accordingly, we reverse the Order denying Plaintiffs' motion for new trial, reverse that portion of its Judgment accepting the jury's verdict on the damages award of $10,000, and remand for a new trial on the issue of damages only. On remand, the trial court is further instructed to ensure no improper collateral source evidence concerning Mother's medical insurance is presented to the jury.[67]

¶40 **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

WISEMAN, J., and GOODMAN, J., sitting by designation, concur.

---

**67.** For example, medical records that reference Mother's medical insurance shall be redacted, and redacted information shall completely obscure information about Mother's medical insurance. Any other measures shall also be taken, as needed, to keep improper information from the jury's consideration. We further observe, in this regard, that the better practice in answer to a question like the one posed by the jury in this case regarding medical insurance, *see* n. 27 and accompanying text, *supra*, is to tell the jury it shall not consider the existence or non-existence of any party's medical insurance in reaching its verdict.