OSCN Found Document:FOX v. CROWGEY

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 FOX v. CROWGEY
2015 OK CIV APP 23
346 P.3d 425
Case Number: 111761
Decided: 10/24/2014
Mandate Issued: 03/23/2015
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2015 OK CIV APP 23, 346 P.3d 425

 

DON FOX, individually, and d/b/a BIG GIANT WAREHOUSE, 
Plaintiff/Appellant,
v.
STAN CROWGEY, K.I.N.E. MINISTRIES, INC., and 
K.I.N.E. SERVICES, LLC, Defendants,
and
DON FOX, individually, and d/b/a 
BIG GIANT WAREHOUSE, Plaintiff/Appellant,
v.
FOX WHOLESALE, L.L.C., TIM 
FOX, individually, and d/b/a FOX WHOLESALE, Defendants/Appellees.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, 
OKLAHOMA
HONORABLE BARBARA G. SWINTON, TRIAL JUDGE

AFFIRMED

Jack S. Dawson, Andrea R. Rust, Brycie M. Loepp, MILLER DOLLARHIDE, Oklahoma 
City, Oklahoma, for Plaintiff/Appellant
Derrick T. DeWitt, Thomas A. Paruolo, 
Melanie K. Christians, Carolyn S. Smith, NELSON, TERRY, MORTON, DEWITT, PARUOLO, 
WOOD, City, Oklahoma, for Defendant/Appellee


JOHN F. FISCHER, PRESIDING JUDGE:
¶1 Plaintiff/Appellant Don Fox individually and d/b/a Big Giant Warehouse 
appeals the decision of the district court following a six day jury trial 
finding in his favor but awarding zero dollars in damages. We affirm finding 
competent evidence in the record to support the jury's verdict and finding no 
prejudicial error in the district court's instructions to the jury.
BACKGROUND
¶2 Don Fox is the owner and operator of Big Giant Warehouse. Big Giant 
Warehouse was a warehouse and retail store dealing in surplus goods. Tim Fox, 
one of Don's sons, began working at Big Giant Warehouse after graduating from 
high school. Tim began working for his father at Big Giant Warehouse when he was 
approximately 15 years old, but he essentially grew up in the warehouse. Tim 
became a full-time employee in approximately 1999. He began performing any type 
of work necessary from sweeping floors and cleaning restrooms to stocking 
shelves and driving forklifts. Tim later was responsible for recruiting new 
buyers and suppliers for Big Giant Warehouse, as well as servicing and 
maintaining its current buyers and suppliers. In 1999, Tim left his employment 
at Big Giant Warehouse after having a disagreement with Don. Upon his departure, 
Tim opened his own business, Fox Wholesale, apparently with Don's blessing, 
dealing in wholesale sales of surplus goods. Tim returned to work at Big Giant 
Warehouse after a couple of months and continued his employment with Big Giant 
Warehouse until September 2005 following another disagreement with Don. Upon his 
second departure from Big Giant Warehouse, Tim operated Fox Wholesale in direct 
competition with Big Giant.
¶3 Don filed suit against Stan Crowgey, K.I.N.E. Ministries and K.I.N.E. 
Services (collectively KINE) in September 2006 asserting causes of action for 
misappropriation of confidential customer data, unfair competition, fraudulent 
inducement, conversion, fraudulent concealment and intentional interference with 
business relations. In separate litigation, Don filed suit against Tim in August 
2007 alleging similar causes of action. Tim filed a motion to dismiss Don's 
original petition, which was sustained by the district court on November 30, 
2007. Don was granted leave to amend. In his amended petition filed in December 
2007, Don alleged causes of action against Tim for misappropriation of 
confidential customer information, unfair competition, breach of fiduciary 
responsibility, fraudulent concealment, conversion and intentional interference 
with business relations. Don sought to establish in both cases that Tim and 
Crowgey had conspired to divert business from Big Giant Warehouse to Fox 
Wholesale and KINE while both were employed at Big Giant Warehouse and 
continuing after both left employment with Big Giant. Don also asserted that Tim 
and Crowgey converted pallets owned by Big Giant Warehouse and sold the same for 
a profit. Don further accused Tim of misappropriation in taking Big Giant 
Warehouse's customer list and Thomas Food Industry Registry. Tim counterclaimed 
against Don for intentional interference with business relations, 
misrepresentation and defamation. Tim's claims against Don were based upon Don's 
alleged promise in 1999 to sell Big Giant Warehouse to Tim and his brother Tom. 
Tim asserted that he returned to Big Giant in 1999 based upon these promises by 
Don. Tim further alleged multiple customers refused to do business with Fox 
Wholesale in 2005, because Don was reporting to customers that Tim was a "thief 
and a liar."
¶4 In July 2010, Don's actions against Tim, Crowgey and KINE were 
consolidated by the district court. Crowgey and KINE failed to defend the 
action. Tim sought summary adjudication as to Don's claims. On June 19, 2012, 
the district court entered summary judgment in favor of Tim on Don's claims for 
fraud and punitive damages, but denied Tim's motion as to Don's claims for 
tortious interference with business relations and conversion. On June 29, 2012, 
the district court sustained Tim's motion to bifurcate the trial, and the action 
proceeded to trial as to Don d/b/a Big Giant Warehouse versus Tim d/b/a Fox 
Wholesale. At the pretrial conference, Don sought to reserve the right to 
reassert his claims for fraud and punitive damages at trial in the event the 
evidence at trial supported such claims. Don listed additional claims for breach 
of fiduciary duty, deceit, faithless servant and misappropriation of 
confidential data/information, which were struck by the district court. Don 
reserved the right to reassert such claims in the event the evidence at trial 
supported such claims.
¶5 The matter was tried to a jury over six days. Don offered a great number 
of exhibits and witnesses to describe the side deals Tim was allegedly involved 
in on behalf of Fox Wholesale while employed by Big Giant Warehouse, which Don 
claimed harmed the business. Tim did not deny that he was involved in such deals 
for Fox Wholesale, but instead described the circumstances surrounding each 
sale, and in many instances, Don's agreement to allow Tim to pursue such sales. 
Tim testified that Don frequently mentioned his desire to sell Big Giant 
Warehouse. Don admitted that after Tim returned to the business in 1999, he 
repeatedly mentioned his plans to sell Big Giant Warehouse to someone other than 
his sons. In relation to the decline in Big Giant Warehouse's sales, evidence 
was introduced regarding Don's earlier lawsuit against Experian in relation to 
false credit reporting, which Don claimed harmed his business relationships.
¶6 Don testified that he was harmed by Tim's actions because "[Tim] was 
spending his time on his deals and not on my deals, yes." (Transcript of Jury 
Trial, Vol. 4, October 18, 2012, p. 236). Don admitted that he refused to do 
business directly with Crowgey or KINE. Don confirmed that he had not spoken 
with a single customer that refused to do business with Big Giant Warehouse 
because of something Tim did. Don admitted that his expert witness, Kenneth 
Klingenberg, had been retained in his lawsuit against Experian, wherein Mr. 
Klingenberg estimated in 2010 that Experian had damaged Big Giant Warehouse to 
the tune of $4,200,000.
¶7 Mr. Klingenberg offered his expert opinion on the amount of damages Big 
Giant Warehouse had sustained as the result of Tim's deals on behalf of Fox 
Wholesale. Mr. Klingenberg estimated the damages to Big Giant Warehouse caused 
by Tim totaled approximately $1,742,710 to $1,822,929. Mr. Klingenberg opined in 
this case that the Experian matter was not a cause of the decreased profits at 
Big Giant Warehouse. Mr. Klingenberg confirmed that he was not asked and in fact 
did not determine whether Tim diverted any business deals from Big Giant 
Warehouse for himself, but instead was only asked to determine lost profits.
¶8 Mr. Klingenberg admitted he did not consider any of the deposition 
testimony offered by Don in rendering his opinion. One assumption Mr. 
Klingenberg made in forming his opinion was that the gross revenue for Big Giant 
Warehouse remained consistent with previous years. Mr. Klingenberg did not take 
into consideration that Don was looking to sell Big Giant Warehouse from 2000 to 
2005, because he was not made aware of that fact. Mr. Klingenberg was also not 
informed of the testimony by Bob Herriott that Big Giant Warehouse employees 
were told to reduce inventory to sell out. As part of his valuation of damages, 
Mr. Klingenberg was not asked to identify any customers that Big Giant Warehouse 
lost due to the actions of Tim.
¶9 Tom Fox, Tim's twin brother, also worked at Big Giant Warehouse since he 
was a young boy. Tom and Don gave Tim their blessing when Tim left Big Giant 
Warehouse in 1999 to start his own business. According to Tom, Tim promised not 
to compete with Don upon his return to Big Giant Warehouse in 1999. In June 
2000, Tom left Big Giant Warehouse after getting into an argument with Don, and 
he went to work on his father's farms. Tom repeatedly asked Tim about returning 
to Big Giant Warehouse, but Tim always told him to stay on the farms.
¶10 Tom discussed the wooden pallets allegedly converted by Tim and Crowgey. 
Tom indicated that all of the pallets, even the broken ones, had value and were 
stored indoors at an off-site warehouse owned by Don. Tom returned from the farm 
to repair a crack in the concrete floor at the off-site warehouse. Tim 
introduced him to a gentleman Tim described as "the guy who is buying our 
pallets." Tom opined that the pallet guy would haul off approximately 185 
pallets with each load. Tom testified that the pallet guy told him he would pick 
up pallets about every three weeks.
¶11 Tom returned to work at Big Giant Warehouse two weeks before Tim left the 
second time. About one week after Tim had quit, Tom spoke with Bob Bowling who 
was carrying out a box Tim purportedly asked him to retrieve from his former 
office. Tom saw multiple items in the box, including Tim's address book 
containing all of the contacts for Big Giant Warehouse, and the Thomas Food 
Industry Registry Books. Tom described the Thomas Food Industry Registry as 
books containing information on every business in the country, from 
manufacturing to wholesale, in the food industry. Tom testified that Clements 
Food stopped doing business with Big Giant Warehouse the week that Tim left. Tom 
also identified a list of approximately seven other businesses that stopped 
doing business with Big Giant Warehouse after Tim left in 2005, which continued 
doing business with Fox Wholesale. Tom identified and discussed the invoices and 
checks involving donations to KINE, sales and purchases by Fox Wholesale, and 
purchases by Big Giant Warehouse. Tom identified what he believed to be his 
brother's and Crowgey's handwriting on a number of the documents.
¶12 A number of other witnesses were presented by Don's counsel. Those 
witnesses confirmed that Crowgey, through KINE, and Tim, through Fox Warehouse, 
had participated in multiple sales of goods, some eventually being sold to Big 
Giant Warehouse. The majority of such witnesses denied hiding anything from Big 
Giant Warehouse or operating in any way to harm Don. Such witnesses corroborated 
the testimony later offered by Tim.
¶13 Tim testified that he had worked for his father at Big Giant Warehouse 
since he was approximately 15 years old. Tim left Big Giant Warehouse in 1999 
due to a disagreement with his father regarding the treatment of another 
employee. Tim returned to Big Giant Warehouse in 1999 after a discussion with 
his mother, as he believed it would be in the best interest of the family. After 
returning to Big Giant Warehouse, Tim worked mostly on the wholesale warehouse 
side of the business; although, he would do whatever needed to be done for the 
business, including buying and selling merchandise, or making any necessary 
repairs for plumbing, electrical or refrigeration problems. Tim stated that his 
brother Tom did not have any responsibilities at Big Giant Warehouse from June 
2000 through August 2005. In Tim's opinion, Big Giant Warehouse never had any 
exclusive customers or vendors that only they bought from or sold to, because 
there was no exclusivity in that business. Tim believed that he fulfilled his 
duties at Big Giant Warehouse from 2000 to 2005.
¶14 Tim testified about the circumstances of each purported side deal 
identified at trial, and admitted to participating in each deal. In relation to 
certain individual sales, Tim told Don in advance that he was going to pursue 
the deal and his father told him to "get your big boy pants on and get after it 
then." (Transcript of Jury Trial, Vol. 5, October 19, 2012, p. 466). After Tom's 
departure from Big Giant Warehouse in 2000, Don repeatedly mentioned that he 
wanted to liquidate and get out of the business. Tim identified two different 
individuals to whom Don considered selling Big Giant Warehouse. Tim was directed 
to stop buying each time Don thought he was going to sell out, but after five or 
six months Tim was directed to start buying for the wholesale business 
again.
¶15 Tim described his relationship with Crowgey and KINE. Tim believed that 
Crowgey had started KINE after leaving his employment with Big Giant Warehouse. 
Tim testified that Don had purchased goods from charities numerous times. Tim 
informed Don that Crowgey was setting up a ministry that might have some goods 
for them to purchase. Tim was unaware that Crowgey's primary donor, Feed the 
Children, had a policy prohibiting the sale of donated goods. Tim identified a 
deal in which Big Giant Warehouse purchased corn from Crowgey, which resulted in 
Crowgey refusing to sell goods to Big Giant Warehouse. Following the corn deal, 
Tim wanted to help Crowgey, and he agreed to sell goods with KINE. Tim admitted 
making approximately $54,000 on the deals he did with KINE over five years.
¶16 Tim denied that he interfered with any business of Big Giant Warehouse 
and stated he would not have sold products on behalf of Fox Wholesale instead of 
Big Giant Warehouse. Tim profited off a number of deals from KINE that were 
eventually sold to Big Giant Warehouse, but Big Giant also made a profit on each 
deal. Tim utilized other companies to sell the product from Fox Wholesale to Big 
Giant Warehouse to prevent Crowgey from finding out the goods were going to Big 
Giant Warehouse. Tim never told Don he was going to make a profit on the deals 
Don allowed him to pursue, but he believed making money on the deals was 
implied. In regard to the deals Tim received from KINE that were eventually sold 
to Big Giant Warehouse, Tim agreed that he did not tell Don where those deals 
originated.
¶17 Tim refuted the testimony offered by Tom concerning multiple issues, 
including the sale of the pallets. Tim confirmed that he allowed Crowgey to sell 
Big Giant Warehouse's discarded pallets, and that he did not inform Don of such 
transactions. Tim described the pallets as broken pallets that were sitting 
outside Big Giant Warehouse. Tim denied receiving any money from the sale of the 
discarded pallets, which usually amounted to less than twenty dollars each time. 
Tim believed he had the authority to dispose of the junk pallets.
¶18 At the conclusion of Tim's testimony on direct examination, his counsel 
moved for directed verdict on Don's claims for conversion and intentional 
interference with business relations. In response, Don's counsel moved to amend 
the pleadings to conform to the evidence and requested to add claims of breach 
of fiduciary duty, deceit, and application of the faithless servant doctrine, 
which was described as a separate measure of damages. The district court 
overruled the motion for directed verdict and allowed the amendment to add 
breach of fiduciary duty and the additional remedy of the faithless servant 
doctrine. Don's counsel did not object or request to make an offer of proof 
regarding the district court's denial of his request to add a claim against Tim 
for deceit.
¶19 Crowgey appeared at trial via video deposition. Generally, Crowgey's 
testimony corroborated Tim's testimony. Through KINE, he sold donated goods, 
primarily from Feed the Children, to Tim, through Fox Wholesale, who sold the 
products to other parties. KINE was operated out of Crowgey's home. Crowgey 
agreed that Tim set the price to charge for the goods KINE sold to Fox 
Wholesale. Crowgey admitted that he and Tim made a profit on these deals.
¶20 Crowgey denied that KINE sold more of the goods than it donated; however, 
he admitted that he violated Feed the Children's policy that donated goods not 
be sold. In relation to the goods received from Feed the Children and other 
charities, KINE donated what it could and sold the remaining products to pay off 
expenses, such as storage, truck and fuel expenses. Crowgey described a number 
of the charities to whom the goods were donated. Crowgey failed keep a written 
list of the charities to which he donated the goods, and as a result, he was 
permanently suspended from receiving donated goods from Feed the Children in 
approximately September 2006. KINE continued to receive donated goods from other 
sources after Feed the Children suspended its donations.
¶21 Crowgey testified that in the deals KINE did with Fox Wholesale, he and 
Tim split the profit 50/50. Crowgey admitted that he and his wife may have used 
KINE to supplement their annual income and pay some home expenses but described 
the income as payment for the work he performed. Crowgey confirmed that for most 
of the transactions Tim was operating out of Big Giant Warehouse, and that they 
used Big Giant Warehouse's facilities. Crowgey testified at length about the 
pallet deal and indicated that Tim allowed him to sell the discarded pallets 
from Big Giant Warehouse and keep the money for himself. Crowgey confirmed that 
he refused to do business with Big Giant Warehouse after a corn deal, in which 
he felt he was not paid the amount owed.
¶22 Don's counsel questioned Crowgey about each individual transaction from 
KINE to Fox Wholesale and from Fox Wholesale to the end buyer. Crowgey 
repeatedly testified that he was only involved in the sales to Fox Wholesale and 
was unaware of any of the specifics of the sales from Fox Wholesale to 
subsequent buyers. Crowgey denied that he and Tim set up the deals to steal 
money from Don or deprive Big Giant Warehouse of any deals. Crowgey further 
denied operating KINE as a smokescreen to make money for himself and his 
family.
¶23 Tim's expert witness, Christopher Daily, testified that he was retained 
to analyze Mr. Klingenberg's damage calculations and provide an opinion on the 
same. First, Mr. Daily criticized Mr. Klingenberg's assumption that Tim diverted 
the deals with Crowgey away from Big Giant Warehouse, based upon the fact that 
Crowgey refused to do business with Don. Mr. Daily indicated that such deals 
could not constitute losses for Big Giant Warehouse, because the deals would 
never have been offered to Don. Mr. Daily also suggested Mr. Klingenberg 
utilized the wrong time period to calculate lost profits, based upon Mr. 
Klingenberg's testimony that the lost profits began in 2005. Mr. Daily indicated 
that the lost profits should have been calculated from July 2001 to August 2005 
during the time period the deals between Tim and KINE were occurring.
¶24 Mr. Daily identified a number of areas that Mr. Klingenberg failed to 
consider that effected his damage calculations, such as: whether the decline in 
profits at Big Giant Warehouse in 2005 was the result of the loss of a key 
employee through Tim's departure; the effect of the issues raised in the earlier 
Experian litigation; and Don's testimony that he was planning on selling out and 
was reducing inventory. In Mr. Daily's opinion, Mr. Klingenberg's calculations 
were not an accurate reflection of damages incurred by Big Giant Warehouse, 
because his calculations never showed that any decline in business was caused by 
anything Tim did.
¶25 At the conclusion of the evidence, both parties moved for directed 
verdict, which was denied by the district court. The court then went off the 
record for the parties and the court to discuss the jury instructions. Following 
closing arguments, the district court instructed the jury and excused them to 
begin deliberations, after which time the court entertained objections to the 
jury instructions. Don's counsel stated: "We take exception to the Court giving 
instructions on both the slander and the interference with business claims of 
the plaintiff. That's it." (Transcript of Jury Trial, Vol. 6, October 22, 2012, 
p. 655-656). Tim's counsel objected to the district court's instructing the jury 
on the following claims: misappropriation of confidential data, breach of 
fiduciary duty, and punitive damages. Tim's counsel also objected to the 
district court's denial of an instruction on the statute of limitations.
¶26 After deliberation, the jury rendered the following verdict:

 
 We, the jury, empaneled and sworn in the above entitled cause, do, upon 
 our oaths find in the favor of the plaintiff, Don Fox doing business as Big 
 Giant Warehouse, as follows:
 A dollar amount of his actual damages in the sum of zero dollars.
 We do find by clear and convincing evidence that the defendant, Tim Fox, 
 acted in reckless disregard of the rights of others.
 We do not find by clear and convincing evidence that the defendant, Tim 
 Fox, acted intentionally and with malice toward 
others.
(Transcript of Jury Trial, Vol. 6, October 22, 2012, p. 657). The district 
court instructed the jury that they would be moving to a second stage of the 
trial regarding punitive or exemplary damages, and excused the jury to the jury 
room. The district court questioned whether the parties wished to waive the 
second stage, because any punitive damages awarded would have to be remitted to 
zero. The district court and the parties discussed the fact that the jury's 
verdict was inconsistent. As to the inconsistent verdict Don's counsel argued: 
"And I think that needs to be pointed out to them that in order they have to 
find actual damages to go to answer the second question, and if they meant not 
to find actual damages, then they can't even go to the second question." 
(Transcript of Jury Trial, Vol. 6, October 22, 2012, p. 659).
¶27 The district court called the jury back and informed them that the 
verdict was contradictory. The court instructed the jury a second time on the 
award of damages, including the following discussion:

 
 And how that is contradictory is that you found in favor of the 
 plaintiff, but you did not award him actual damages. So the only way you 
 would go to the second question about whether or not you found by clear and 
 convincing evidence that the defendant acted in the reckless disregard of 
 the right of others is if you had given the plaintiff actual damages.
 So, we're going to ask you to go back to the jury room and we'll give you 
 another verdict form. And then if you all will deliberate and determine how 
 you wish the verdict to read understanding that 28 is a two-step 
 process.
(Transcript of Jury Trial, Vol. 6, October 22, 2012, p. 661). The jury 
rendered a verdict in Don's favor again awarding him zero damages, and finding 
an absence of clear and convincing evidence that Tim acted in reckless disregard 
or with malice.
¶28 Don filed a motion for new trial requesting the trial court grant a new 
trial on either damages only or as to all issues. In support of the motion, Don 
argued that the jury's verdict finding in favor of Don but awarding zero damages 
was inconsistent and contrary to law. Don also argued that the district court's 
refusal to instruct the jury on fraud constituted an error of law. Tim objected 
noting that the award of zero damages was not inconsistent where conflicting 
evidence on the issue of damages was presented to the jury. On the issue of 
fraud, Tim argued first that Don failed to preserve his objection at trial 
regarding the district court's refusal to instruct the jury on fraud or deceit, 
and second, that Don failed to present sufficient evidence at trial to warrant 
an instruction on fraud. The district court overruled the motion for new trial 
finding: "that the jury took considerable time to determine whether or not they 
were going to consider dollar amounts and they returned with zero." (Transcript 
of Proceedings of Motion for New Trial, February 1, 2013, p. 15). Upon such 
rulings, Don instituted the present appeal.
STANDARD OF REVIEW
¶29 Upon appellate review, a jury's verdict is conclusive as to all disputed 
facts and conflicting statements. Stroud v. Arthur Anderson & Co., 2001 OK 76, ¶ 9, 37 P.3d 783, 787. "Where (1) there 
is any competent evidence which reasonably supports the jury's verdict and (2) 
there are no prejudicial errors shown in the trial court's jury instructions, 
neither the verdict nor the judgment based thereon will be disturbed on review." 
Id., 37 P.3d at 787-788. The appellate courts "will not engage in 
deciding which party produced evidence of the greater weight. The 
decision--where the preponderance of the evidence lies--is left to the jury 
which is the exclusive judge of the witnesses' credibility." Id., 37 P.3d 
at 788. In deciding whether the evidence presented is sufficient to "sustain the 
judgment the Court views all evidence in the light tending to support the 
judgment, 'together with every reasonable inference deducible therefrom, 
rejecting all evidence adduced by the adverse party which conflicts with it.'" 
Id. (citations omitted).
¶30 "In reviewing a trial court's decision denying a motion for new trial, 
the appellate court employs an abuse of discretion standard of review." Lerma 
v. Wal-Mart Stores, Inc., 2006 
OK 84, ¶ 6, 148 P.3d 880, 
883. "A court abuses its discretion when it uses that standard to an end or 
purpose that is justified neither by reason nor by evidence. Abuse of discretion 
lies in a manifestly unreasonable act, supported by untenable grounds or 
reasons." Id.
ANALYSIS
¶31 "A clear showing of prejudice is required before we will allow a trial 
court to set aside a jury verdict, or set it aside ourselves, for excessiveness 
or inadequacy of damages." Clark v. Bearden, 1995 OK 71, ¶ 11, 903 P.2d 309, 312. The Oklahoma 
Supreme Court has held that: "a jury verdict will not be set aside as inadequate 
unless it is 'beyond all measure unreasonable and outrageous and such as 
manifestly shows the jury to have been actuated by passion, partiality, 
prejudice or corruption.'" Death of Lofton v. Green, 1995 OK 109, ¶ 10, 905 P.2d 790, 792 (citing Park v. 
Security Bank & Trust, 1973 
OK 72, ¶ 9, 512 P.2d 113, 
116).

 
 I. Inconsistent Verdict 

¶32 In his first proposition of error, Don argues entitlement to a new trial 
on damages alone or on all matters, because the jury's award of zero dollars in 
damages was inconsistent within itself based upon the verdict in his favor on 
his causes of action for interference with business relations, breach of 
fiduciary duty, conversion, and misappropriation of confidential information. 
Don asserts that damage was an essential element of each of his claims requiring 
an award of some amount of damages, and the uncontroverted evidence at trial 
definitively established the amount of his damages.

 
 A. Verdict Inconsistent Within Itself 
¶33 The Oklahoma Supreme Court described a verdict inconsistent within itself 
as follows: "Where a jury returns a verdict allowing recovery for some elements 
of damages but specifically denying recovery for other elements of damages which 
have been clearly proved, and the issue of liability is the same with reference 
to all elements of damage, the verdict is inconsistent within itself." 
Burkett v. Moran, 1965 OK 
165, ¶ 9, 410 P.2d 876, 
877-878 (citing Hallford v. Schumacher, 1958 OK 53, ¶ 0, 323 P.2d 989 (syllabus)). In 
Burkett, plaintiff was injured in an automobile accident and sued to 
recover the cost of repairs to his vehicle, medical expenses, lost wages and 
pain and suffering. The jury found in plaintiff's favor. However, on the verdict 
form, the jury delineated the amount of damages awarded to plaintiff solely for 
car repairs, medical expenses and one month's salary. The jury did not award 
damages for pain and suffering. Upon review, the Supreme Court concluded:

 
 Under the uncontradicted evidence, if defendant was liable to plaintiff 
 at all, plaintiff was entitled to recover damages for past pain and 
 suffering. The 'itemized statement' added by the jury conclusively shows 
 that no award was made for this element of damages. The verdict is therefore 
 inconsistent with itself and plaintiff is entitled to a new 
 trial.
Burkett, ¶ 18, 410 P.2d 878-879. Unlike Burkett, the jury 
herein returned a general verdict in favor of Don but awarded zero dollars in 
damages as to all claims. As such, the verdict awarding Don zero damages is not 
inconsistent within itself as described in Burkett.

 
 B. Award of Zero Damages 
¶34 "Damages are a remedy for compensation for a legal wrong or injury. . . . 
The recovery of damages is a jury question. Broad discretion is given to the 
jury to determine the amount of damages." Estrada v. Port City Prop., 
Inc., 2011 OK 30, ¶ 35, 258 P.3d 495, 508. Where the 
evidence of record supports the amount of damages awarded by the jury, appellate 
courts "will not invade the jury's province and substitute our judgment as a 
fact-finding tribunal." Id.
¶35 Don argues that because the jury, through its general verdict, found in 
his favor on all of his claims, including the claim for breach of fiduciary 
duty, that they were required to award damages, including damages under the 
faithless servant doctrine. In the motion to amend the pleadings to conform to 
the evidence made during trial, Don's counsel admitted that the faithless 
servant doctrine was not a separate claim, but merely an additional remedy upon 
which the jury could award damages.
¶36 The Oklahoma Supreme Court has considered cases involving an inconsistent 
verdict as the result of an award of zero damages and declared that the 
appellate court on review must determine whether there was sufficient evidence 
at trial to support the award of zero damages. Pine Island RV Resort, Inc. v. 
Resort Mgmt., Inc., 1996 OK 
83, ¶ 27, 922 P.2d 609, 614. 
As in Baker v. Locke Supply Co., 1987 OK 27, ¶ 7, 736 P.2d 155, 157, the questions of 
whether (1) Tim violated any duties to Big Giant Warehouse and (2) whether Don 
and Big Giant Warehouse sustained any damages as a direct result of Tim's 
actions were vigorously disputed at trial, and both parties introduced evidence, 
including expert testimony in support of their contentions. Despite Don's 
repeated assertions, the record reflects that no amount of damages was ever 
admitted or uncontroverted at trial. As set forth in Baker, Don "had the 
burden to prove by a preponderance of the evidence that [he] did sustain 
injuries and was entitled to be compensated for [his losses]." Id.
¶37 In Wright v. Central Oklahoma Milk Producers Ass'n, 1973 OK 15, 509 P.2d 464, the Supreme Court 
upheld the jury's verdict in an auto negligence case in plaintiff's favor 
awarding damages for car repairs and his medical bills related to the 
physician's evaluation after the accident, but declining to award damages for 
physical injuries or pain and suffering. The Supreme Court found conflicting 
evidence of whether plaintiff suffered any injuries in the accident that 
aggravated his preexisting arthritic condition. The Supreme Court held that:

 
 [I]n an action for damages, where the evidence is conflicting but the 
 verdict of the jury is sustained by competent evidence, it is an abuse of 
 discretion for the trial court to grant a new trial upon the ground that the 
 verdict of the jury is contrary to the evidence.
Id. ¶ 39, 509 P.2d at 470.
¶38 The verdict rendered establishes that the jury found Tim's actions were 
improper, but also that Don failed to prove he was entitled to be compensated 
for the same. Upon thorough review of the record, we conclude the evidence 
presented at trial supported the jury's award of zero damages. Pine Island RV 
Resort, 1996 OK 83, ¶ 27, 922 
P.2d at 614. We further find that the jury's award of zero damages was not 
'beyond all measure unreasonable and outrageous and such as manifestly shows the 
jury to have been actuated by passion, partiality, prejudice or corruption.'" 
Death of Lofton, 1995 OK 
109, ¶ 10, 905 P.2d at 792.

 
 II. Motion for New Trial 
¶39 Don's second proposition of error alleges the district court abused its 
discretion in overruling his motion for new trial based upon the inconsistent 
verdict rendered by the jury. The Oklahoma Supreme Court has long recognized 
that the district courts are vested with wide discretion in ruling upon a motion 
for new trial. Garnett v. Government Emp. Ins. Co., 2008 OK 43, ¶ 29, 186 P.3d 935, 945. "When a party is 
prevented from having a fair trial as a result of an error which materially 
affects the substantial rights of the party, a new trial is required." 
Taliaferro v. Shahsavari, 2006 OK 96, ¶ 13, 154 P.3d 1240, 1244. "We review a 
trial court's order denying a motion for new trial for error of a pure question 
of law or for an abuse of discretion which is arbitrary, clearly against the 
evidence, and manifestly unreasonable." Garnett, ¶ 29, 186 P.3d at 
945-946. The primary basis for Don's motion for new trial focused on the jury's 
award of zero dollars in damages. In accord with our determination that the 
jury's award of zero damages is supported by competent evidence in the record, 
we find the district court's denial of Don's motion for new trial based upon an 
inconsistent verdict was neither an error of law nor an abuse of the district 
court's discretion.

 
 III. District Court's Post-Verdict Discussion with Jurors 
 
¶40 In his third proposition of error, Don alleges the district court abused 
its discretion in conducting an ex parte interview of jurors after the verdict 
was rendered and allowing one juror's comments to influence her decision on 
appellant's motion for new trial. Don's allegations are directed to the 
following comments by the district court at the hearing on the motion for new 
trial:

 
 Now to the Motion for New Trial. And I don't now [sic] if it's on the 
 record because I don't remember if we had closed out the record or not, but 
 after I excused you from the courtroom to ask the jurors if they had any 
 questions of me, and then I had intended to invite you back if anybody was 
 willing to stay and no one was.
 But what happened while I was asking the jurors if they had any 
 questions, one of the ladies on the front row, and now I can't remember, of 
 course, what her name was, she said, "Do you think they got the message 
 we're trying to send?"
 And I said, "Well the message I got from your verdict was you didn't 
 agree with what the son did, but you didn't think the father proved the 
 amount of dollars that he was damaged."
 And she said, "Yes, that's the message we're trying to send."
 So I said, "Well, you're welcome to talk to the attorneys and explain 
 that to them, but I'll let you know that that's what your thoughts 
were."
 And so then they didn't stay and visit with you guys and so I don't know 
 what conversations you guys had with them afterwards in the hallways, or if 
 you had any follow-up conversations with them. So, that's my added 
 information that I have for you as to why I didn't think that a new trial 
 was appropriate, because I think they were - they thought they were very 
 clear in the message they were trying to send is they wanted Mr. Fox senior 
 to have a verdict in his favor, but they just couldn't come up with a dollar 
 amount that they thought had been proven.
(Transcript of Proceedings of Motion for New Trial, February 1, 2013, p. 
6-7). In deciding upon the motion for new trial, the district court ruled:

 
 I agree with you that you put on evidence of damages, but I cannot agree 
 that every claim had to have a value. And that the jury took considerable 
 time to determine whether or not they were going to consider dollar amounts 
 and they returned with zero. So, I will not disturb their verdict and I will 
 overrule the Motion for New Trial.
(Transcript of Proceedings of Motion for New Trial, February 1, 2013, p. 
15).
¶41 In arguing the impropriety of the district court's discussions with the 
jury herein, Don relies upon Kerlin v. Hunt, 2013 OK CIV APP 83, 310 P.3d 1114. In Kerlin, 
the parties and the court became concerned following a jury verdict with the 
inadequacy of the award due to the jurors' improper consideration of extraneous 
evidence. After polling the jury, the court and the parties agreed that there 
was nothing further to do with the jury, and plaintiffs' counsel stated the 
inadequacy of the verdict would have to be addressed in post-trial motions. The 
court then excused the parties and conducted an off-the-record discussion with 
the jury, which included discussions directly involving the jurors' decision on 
the merits and the basis of their damages award. This Court found the district 
court abused its discretion and that plaintiffs were substantially prejudiced by 
the court's ex parte discussions:

 
 Even if she ultimately did not consider that discussion in her denial of 
 Plaintiffs' motion for new trial--as [Defendant] assumes--there is an 
 appearance of impropriety; that is, it appears the trial judge discussed 
 issues with the jury ex parte that went to matters the judge knew she was 
 going to be asked to address in a post-trial motion from Plaintiffs. There 
 is, thus, an appearance that the discussion had an impact on her decision to 
 deny the motion for new trial. . . .
Id. ¶ 37, 310 P.3d at 1125-1126.
¶42 Although Don argues the district court violated Rule 2.9 of the Code of 
Judicial Conduct regarding ex parte communications, Rule 2.8 of the Code of 
Judicial Conduct concerns the courts' interactions with a jury. Sub-section (C) 
declares that the court "shall not commend or criticize the verdict of the jury 
other than in a court order or opinion in a proceeding. However, after the 
conclusion of a trial a judge is encouraged to express appreciation to the 
jurors for their service to the judicial system and to the community." Oklahoma 
Code of Judicial Conduct, Rule 2.8(C), 5 O.S.2011 Ch. 1, App. 4. Comment 3 to 
Rule 2.8 states: "A judge who is not otherwise prohibited by law from doing so 
may meet with jurors who choose to remain after trial but should be careful not 
to discuss the merits of the case." Id. The district court's 
communication with the jurors post-verdict falls squarely within the perimeters 
of Rule 2.8.
¶43 Unlike Kerlin, the district court herein did not inquire of the 
jurors regarding their verdict or the merits of the parties' claims. Instead, 
the district court merely asked the jurors if they had any questions for the 
court. In the district court's discussion with the female juror, no information 
was provided by the juror regarding the jury's specific findings upon the 
substance, the elements or the basis of Don's claims. The district court did not 
receive any additional information from the juror's comments that was not 
already evident from the verdict rendered. The district court's discussion with 
the jury did not address the merits of the case, and thus did not violate Rule 
2.8 of the Code of Judicial Conduct. Despite Don's assertions, nothing in the 
district court's disclosure of the discussion with the jurors suggests the court 
relied upon the juror's comments in denying Don's motion for new trial. In this 
case, the district court's post-verdict discussion with the jury raises no 
appearance of impropriety. Accordingly, we find no abuse of discretion in the 
district court's post-verdict discussion with the jurors.

 
 IV. Jury Instructions 
¶44 In his fourth proposition of error, Don argues that the district court 
erred in refusing to instruct the jury on fraud or deceit, as the evidence 
presented clearly warranted such instruction. As described above, the district 
court sustained Tim's motion for summary judgment on Don's claim for fraud or 
deceit in June 2012. During Don's argument to amend the pleadings to conform to 
the evidence made at trial, he reasserted his claim for deceit in addition to 
the claim for breach of fiduciary duty and the remedy of the faithless servant 
doctrine. The district court allowed the amendment to include Don's claims for 
breach of fiduciary duty and to assert the faithless servant doctrine. Don's 
counsel did not object to the district court's refusal to allow an amendment to 
include Don's claim for deceit or make any record regarding the same. 
(Transcript of Jury Trial, Vol. 5, October 19, 2012, p. 515-516). After the jury 
began deliberations, the district court held argument on the record regarding 
objections to the jury instructions. Don's counsel asserted the following 
objection to the jury instructions: "We take exception to the Court giving 
instructions on both the slander and the interference with business claims of 
the plaintiff. That's it." (Transcript of Jury Trial, Vol. 6, October 22, 2012, 
p. 655-656). No objection was made by Don's counsel concerning the district 
court's refusal to instruct the jury on fraud or deceit.
¶45 Title 12 O.S.2011 section 578 dictates that:

 
 A party excepting to the giving of instructions, or the refusal thereof, 
 shall not be required to file a formal bill of exceptions; but it shall be 
 sufficient to make objection thereto by dictating into the record in open 
 court, out of the hearing of the jury, after the reading of all 
 instructions, the number of the particular instruction that was requested, 
 refused and is excepted to, or the number of the particular instruction 
 given by the court that is excepted to.
Oklahoma Supreme Court Rule 1.11(e)(1) states in relation to jury 
instructions: "Where a party complains of an instruction given or refused, the 
party shall cite to the place in the record on appeal where said instruction may 
be found, together with the objection thereto." 12 O.S.Supp.2013, ch. 15, app. 
1. Because Don failed to preserve any objection at trial to the district court's 
refusal to amend the pleadings to include his claim for deceit or to instruct 
the jury on such claim, we review the jury instructions for fundamental error. 
B-Star, Inc. v. Polyone Corp., 2005 OK 8, ¶ 22, 114 P.3d 1082, 1087.
¶46 The Oklahoma Supreme Court has repeatedly reiterated that:

 
 In giving instructions, the trial court is not required to frame the 
 issues, but it must state the law correctly. Fundamental error occurs when 
 the trial court does not accurately instruct the jury on the law. The test 
 of reversible error in giving jury instructions is whether the jury was 
 misled to the extent of rendering a different verdict than it would have 
 rendered had the errors not occurred.
Taliaferro, 2006 OK 
96, ¶ 25, 154 P.3d at 1247-1248. The district court properly instructed the 
jury upon all of the issues presented at trial. Because Don's claim for fraud or 
deceit was not a claim presented at trial, the district court committed no 
fundamental error in refusing to instruct the jury upon such claim.
CONCLUSION
¶47 Upon thorough review of the record, we find competent evidence to support 
the jury's verdict and award of zero dollars in damages to Don concluding that 
the verdict is not inconsistent within itself. We find no abuse of discretion in 
the district court's post-verdict discussion with the jurors, as the same was 
conducted in compliance with Rule 2.8 of the Code of Judicial Conduct. 5 
O.S.2011 Ch. 1, App. 4. We further find no prejudicial or fundamental error in 
the district court's instructions to the jury. Thus, we find no abuse of 
discretion in the district court's denial of Don's motion for new trial. 
Accordingly, the decision of the district court is hereby AFFIRMED.

¶48 AFFIRMED.

RAPP, J., and THORNBRUGH, J., concur.





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2013 OK CIV APP 83, 310 P.3d 1114, KERLIN v. HUNT
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1987 OK 27, 736 P.2d 155, 58 OBJ 1125, Baker v. Locke Supply Co.
Discussed
 2001 OK 76, 37 P.3d 783, 72 OBJ 2725, STROUD v. ARTHUR ANDERSEN & CO.
Discussed
 1958 OK 53, 323 P.2d 989, HALLFORD v. SCHUMACHER
Discussed
 1965 OK 165, 410 P.2d 876, BURKETT v. MORAN
Discussed
 1995 OK 71, 903 P.2d 309, 66 OBJ 2139, Clark v. Bearden
Discussed
 1995 OK 109, 905 P.2d 790, 66 OBJ 3299, Death of Lofton v. Green
Discussed at Length
 1973 OK 15, 509 P.2d 464, WRIGHT v. CENTRAL OKLAHOMA MILK PRODUCERS ASS'N
Discussed
 1973 OK 72, 512 P.2d 113, PARK v. SECURITY BANK AND TRUST COMPANY
Discussed
 2005 OK 8, 114 P.3d 1082, B-STAR, INC. v. POLYONE CORPORATION
Discussed
 2006 OK 84, 148 P.3d 880, LERMA v. WAL-MART STORES, INC.
Discussed
 2006 OK 96, 154 P.3d 1240, TALIAFERRO v. SHAHSAVARI
Discussed at Length
 1996 OK 83, 922 P.2d 609, 67 OBJ 2332, Pine Island RV Resort, Inc. v. Resort Management, Inc.
Discussed at Length
 2008 OK 43, 186 P.3d 935, GARNETT v. GOVERNMENT EMPLOYEES INSURANCE COMPANY
Discussed
 2011 OK 30, 258 P.3d 495, ESTRADA v. PORT CITY PROPERTIES, INC.
Discussed